1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  K. F., by and through his guardian ad litem,     )  1:08-cv-01426-JLT
    Sarah F.,                                        )
12                                                    )  DECISION AND ORDER DENYING
                        Plaintiff,                    )  PLAINTIFF'S SOCIAL SECURITY
13                                                    )  COMPLAINT (DOC. 1)
            v.                                        )
14                                                    )  ORDER DIRECTING THE ENTRY OF
    MICHAEL J. ASTRUE, Commissioner of                )  JUDGMENT FOR DEFENDANT MICHAEL
15  Social Security,                                  )  J. ASTRUE, COMMISSIONER OF SOCIAL
                                                      )  SECURITY, AND AGAINST PLAINTIFF
16                      Defendant.                     )  K.F.
                                                      )
17  _____         )

18
19          In this proceeding, Plaintiff, by and through his guardian ad litem, Sarah F., seeks judicial

20  review of a final decision of the Commissioner of Social Security (Commissioner) denying his

    application for Supplemental Security Income (SSI) benefits.  In his October 21, 2005,
21
    application, Plaintiff alleged that he had a disability due to problems with hearing, speaking,
22
    communicating, and completing tasks, his short attention span and poor memory, his poor
23
    coordination and his need for prompting with self care. (A.R. 170.) The parties have consented to
24
    the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1).
25
            The decision under review is that of Social Security Administration (SSA) Administrative
26
    Law Judge (ALJ) Christopher Larsen dated January 23, 2008  (A.R. 10-19).  His decision was
27
    rendered after a hearing held on November 14, 2007, at which Plaintiff and his mother appeared,
28

                                                    1

and Plaintiff testified with the assistance of counsel (A.R. 10, 431-63). The Appeals Council denied Plaintiff's request for review on June 2, 2008 (A.R. 2-4), and thereafter Plaintiff filed his complaint in this Court on July 30, 2008. Briefing commenced on May 5, 2009, with the filing of Plaintiff's brief. Defendant filed opposition on June 8, 2009, and Plaintiff's reply was filed on June 23, 2009. The matter has been submitted without oral argument to the Magistrate Judge.

I. Jurisdiction

Plaintiff's complaint was timely filed on July 30, 2008, less than sixty days after the mailing of the notice of decision on or about June 2, 2008. 42 U.S.C. §§ 1383(c)(3) and 405(g)

II. Standard and Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of evidence that supports the decision. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner. The determination of the Commissioner as to a factual matter will stand if it is supported by substantial evidence because it is the Commissioner's duty, rather than the Court's, to resolve conflicts in the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's determination that the claimant is not disabled if

the Commissioner applied the proper legal standards and if the Commissioner's findings are supported by substantial evidence. See, Sanchez v. Secretary of Health and Human Services, 812 F.2d 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If the Court concludes that the ALJ did not use the proper legal standard, the matter will be remanded to permit application of the appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th Cir. 1987).

III. Disability

In determining disability in children with respect to SSI benefits, the SSA will consider whether the child is performing substantial gainful activity.  If not, the SSA must consider whether an impairment or combination of impairments is severe and if severe, whether the impairments meet, medically equal, or functionally equal the listings.  Finally, the SSA must determine whether such impairments have lasted, or are expected to last, for twelve continuous months. 20 C.F.R. §§ 416.923, 416.924(a). If the child's impairment meets or functionally equals an impairment in the listings and meets the durational requirement, then disability is conclusively presumed and benefits are awarded. 20 C.F.R. §§ 416.924(d). If the impairment does not meet or functionally equal a listed impairment or meet the durational requirement, then the child is not disabled. 20 C.F.R. § 416.924(d)(2).  SSI benefits are not payable until the month after the month in which the claimant applied for SSI. 20 C.F.R. § 416.335.

Here, the ALJ found that Plaintiff, who was born on March 13, 1999, and thus was a school-age child at all pertinent times, was not engaged in substantial gainful activity and had severe impairments of attention deficit/hyperactivity disorder, borderline intellectual functioning, learning disorder not otherwise specified and fetal-alcohol effects. (A.R. 13.) The ALJ concluded that Plaintiff had no impairment or combination thereof that met, medically equaled, or functionally equaled the listed impairments. Accordingly, the ALJ determined that he was not disabled.

Plaintiff argues 1) the ALJ erred in not expressly or "facially" (Pltf.'s Brief, p. 5) addressing the question of whether Plaintiff's impairments equaled listing 112.05 for mental retardation; and 2) the ALJ erred in rejecting objective testing and opinion evidence that Plaintiff

asserts established that Plaintiff had marked dysfunction in multiple areas.

IV. <u>Medical Evidence of Functioning</u>

The ALJ considered Plaintiff's entire medical history, including that which preceded October 21, 2005, the date of Plaintiff's application for benefits. (A.R. 10.)

In May 2003, senior counselor Sidney R. Jackson II of the Central Valley Regional Center (CVRC) assessed Plaintiff, who was four years old at the time, for speech that reflected impaired articulation and significant delays in development. (A.R. 55-57, 255-57.) Audiologic evaluation reflected hearing in both ears that was within normal limits. (A.R. 260-61.) In June 2003, Matthew A. Battista, Ph.D., evaluated Plaintiff to determine eligibility for CVRC services. (A.R. 421-24.) Plaintiff's mother reported that he had communication difficulties, hyperactivity, difficulty sharing and interacting with other children, greater difficulty behaving with the mother, and attention-seeking behaviors. <u>Id.</u> However, the mother reported that Plaintiff colored, drew, and engaged in age-appropriate forms of imaginary play with toys and games with a younger sibling. (A.R. 422)

The examiner observed Plaintiff's deteriorating behavior during the session that, in his opinion, reflected oppositional conduct as distinct from being related to a level of activity or cognitive problem. (A.R. 422-3) The examiner determined that Plaintff's test results on the Stanford-Binet Test of Intelligence (4th ed.) were verbal reasoning, 71; abstract/visual reasoning, 89; quantitative reasoning, 88; short-term memory not computed, with a partial test composite score of 80. The results of the Vineland Adaptive Behavior Scale were communication domain, standard score of 71, age-equivalent of 1-10; daily living skills domain, 66, age equivalent 2-5; socialization domain, 84, age equivalent 1-11; and motor skills domain, 84, age equivalent 3-5, with an adaptive behavior composite of 66. (A.R. 423.) Jackson believed that Plaintiff's level of activity, sustained attention when structured and social functioning, aside from conduct issues, were relatively intact. Jackson opined that Plaintiff's below-average verbal skills and unruly behavior did not appear to be cognitively based or due to intrinsic social deficit or problems with attention/level of activity. Rather Jackson believed that they were conduct-discipline-based issues.

Jackson provided a diagnosis as mixed receptive expressive language disorder.  He recommended speech and language evaluation, enrollment in pre-school with focus on enhancing communication ability and parenting classes for the mother. (A.R. 424.)

In July 2003, a multi-disciplinary team that reviewed Plaintiff's case determined that Plaintiff was not eligible for CVRC. (A.R. 251-52.) Dr. Pean Lai evaluated the psychological and social information in the chart and determined that Plaintiff did not have mental retardation although Dr. Battista determined that he had mixed receptive and expressive language disorder. (A.R. 251.)

In October 2003 a note by Sheri Rossi, M.A., L.M.F.T., indicated that Plaintiff's mother had called concerning Plaintiff's aggressive and hurtful behavior to his siblings, and in November 2003, a plan of care was created. (A.R. 391-94.) A couple of therapy sessions occurred, but due to repeated failures to attend, the file was to be closed by January 2004. (A.R. 383-90.)

In November 2003, Plaintiff was evaluated by the County of Fresno Department of Children and Family Services (DCFS). (A.R. 407-18.) Plaintiff's mother complained of hyperactivity, distraction, and aggressive and self-destructive behavior. The Licensed Clinical Social Worker diagnosed Plaintiff with attention deficit/hyperactivity disorder, not otherwise specified and disruptive behavior disorder, not otherwise specified.  (A.R. 416) The LCSW determined Plaitniff's global assessment of functioning (GAF) score was 60. (A.R. 416.) The LCSW felt that part of Plaintiff's hyperactivity and oppositional behavior resulted at least in part from a lack of consequences for misbehavior.  Id. The LCSW recommended individual, family and collateral therapy. (A.R. 416-17.)

In January 2005, Stephen Sacks, M.A., CCC-SLP, Speech/Language Specialist, evaluated Plaintiff's phonological processes.  Tests results revealed that Plaintiff had an articulation deficit, but that his voice and fluency were adequate.  Sacks recommended that Plaintiff undergo speech therapy. (A.R. 109-10.)

In July 2005, David L. Hellwig Ph.D., from DCFS, performed a clinical assessment of Plaintiff, who was six years old at the time. (A.R. 402-06, 395-96.) Plaintiff's mother reported

Plaintiff displayed anger and impulsive behavior. Dr. Hellwig's mental status exam revealed that Plaintiff had poor articulation, memory, comprehension, judgment, and insight. He diagnosed Plaintiff as having ADHD, depressive disorder, not otherwise specified; disruptive behavioral disorder, not otherwise specified. Dr. Hellwig wanted to rule out pervasive developmental disorder, anxiety disorder, PTSD, ODD and intermittent explosive disorder. Dr. Hellwig determined that Plaintiff had a GAF score of 50. Dr. Hellwig noted that a strength of Plaintiff's was his ability to follow the clinician's directives during the assessment. (A.R. 405, 397.)

In October 2005, G. Michael Bishop, Ph.D., L.M.F.T., wrote to Plaintiff's mother to provide a brief summary of the July assessment of Plaintiff. (A.R. 250.) Dr. Bishop related that the purpose of the assessment was to determine the seriousness of Plaintiff's symptoms of difficulties sustaining attention, being easily distracted and hyperactive, being easily frustrated and experiencing strong temper outbursts, and exhibiting opposition to adult directives and difficulty regulating emotions and impulses. After reviewing a previous assessment and treatment history, Dr. Bishop determined that the symptoms were seriously disrupting Plaintiff's academic and family adjustment. He recommended outpatient therapy and diagnosed the boy with symptoms consistent with combined type, attention deficit hyperactive disorder. (A.R. 250.)

On August 12, 2005, the mother and Plaintiff had a counseling session at which time,the therapist and mother determined that she would engage in Behavior Management training for ADHD behaviors, and to discuss the use of medications and possible referral. (A.R. 381.) The record indicates that the mother attended four sessions. (A.R. 374-380) On October 5, 2005, the therapist determined that he would meet with the parent on an as-needed basis. (A.R. 374-78.)

In October 2005, Dr. Razia Sheikh prescribed Concerta to addresss Plaintiff's ADHD diagnosis. (A.R. 304.)

In December 2005, Dr. Sachs reported that Plaintiff showed excellent progress since January 2005, when speech therapy had commenced. His articulation disorder did not interfere with his being understood ninety per cent of the time. He could follow single-step instructions and his condition did not cause problems in academic performance, socializing, or deficiencies in

maintaining concentration, persistence, or pace. Dr. Sachs refused to report his previous test scores because "Initial reports are not longer appropriate as he has improved so much." Dr. Sachs reported that Plaintiff would be discharged within the next few months. (A.R. 359-61.)

In January 2006, the speech therapist assessed Plaintiff's present levels of educational performance and opined that Plaintiff had made significant improvement in his speech and was able to say correctly almost all of his previously erroneous sounds. (A.R. 103.)

In January 2006, Plaintiff's mother reported to therapist Dr. Bishop that Plaintiff was getting medication from his pediatrician and was doing much better. However, the mother wanted to transfer his care from the pediatrician to the clinic. This would necessitate a transfer of the case to a new therapist due to Dr. Bishop's change to other programs. Dr. Bishop noted that the mother "appears to still want assistance although child is doing much better now." (A.R. 313.)

In late February 2006, licensed mental health clinician Paula Harris, noted that Plaintiff had been taking Concerta for two months. He had demonstrated dramatic improvement in his Plaintiff's behavior and ability to focus and learn at school. His mother continued to complain about his behavior at home, though. Harris planned weekly therapy sessions to help Plaintiff, who had been abandoned by his father, with his anger and feelings of loss and abandonment. (A.R. 312.)

At a mid-March therapy session, Plaintiff drew good pictures, successfully played an unfamiliar card game after catching on very quickly, and exhibited an affect matching excitement; he warmed quickly to the therapist despite being shy. The plan was to work on developing trust so that they could begin to deal with his behavior problems, which were primarily at home. (A.R. 310.) In later March the therapist, who was leaving the county, reported that Plaintiff was a bright child who might appear to be slow if one did not take time to know him. Plaintiff continued angry outbursts at home, but not at school. Harris planned to transfer the case to a permanent therapist and recommended support with parenting skills for the mother. (A.R. 309.)

In March 2006, Plaintiff's pediatrician refilled his ADHD prescription. The doctor noted that Plaintiff was "Doing very well." (A.R. 306.) The doctor continued to refill the medication

throughout 2006. (A.R. 305.)

On May 26, 2006, consulting examiner Lynne Leeper Reinfurt, Ph.D., DABPS, reviewed the previous assessments and Plaintiff's discharge from speech therapy around December 2005. She completed a psychological evaluation and examination of Plaintiff at the request of the Department of Social Services Disability Evaluation Division to obtain information for determining the eligibility of Plaintiff for disability services. (A.R. 354-56.) Plaintiff's mother reported clumsiness, poor management of personal hygiene and activities of daily living, moodiness, failure to get along well with others, and tantrums. Dr. Reinhurt noted that Plaintiff had not been receiving special services in his first grade classroom and he had good academic abilities. He was uncooperative at home and struggled with his siblings. Plaintiff had taken Concerta before the appointment. He was alert, oriented for person, with adequate attention and concentration, adequate knowledge, concrete thought processes, and cognitive ability probably within the low average range with no evidence of disordered thinking or bizarre ideation. Speech was clear and coherent; initially immature affect and manner changed in response to basic interventions and he was very responsive and worked quite well throughout a lengthy evaluation. Generally somber, Dr. Reinbhurt noted that he displayed a "dimpled smile now and then," that he had adequate rapport and rather good frustration tolerance. He reported that he liked school and had friends there. The assessment was considered an adequate estimate of Plaintiff's capabilities. (A.R. 354-55.)

Dr. Reinfurt administered the Wechsler Intelligence Scale for Children-IV (WISC-IV), with a composite score for a full scale IQ of 78, indicating a borderline to low average range of cognitive functioning, with subtest scaled scores ranging from five to nine. His prorated verbal comprehension index score was 89, his prorated perceptual reasoning index score was 82, his working memory index score was 83 and his processing speed index was 75. Plaintiff had problems focusing his attention during timed tasks requiring quick, accurate scanning, sequencing or discrimination of simple visual information. (Id. p. 355.)

On the Wide Range Achievement Test (third ed.), Plaintiff produced academic

achievement scores ranging from first to third grade reading, with effective use of phonetic strategies. Dr. Reinhurt noted that Plaintiff was weaker in number concepts with his arithmetic scores at the first grade equivalent. The Bender Gestalt Test II (second ed.) produced a standard score of 107, which was average. However, a score of 85 on recall placed him in the low average category and Dr. Reinhart indicated that this might reflect an attentional problem. (Id.)

Plaintiff's scores on the Vineland Adaptive Behavior Scales, which test communication, daily living skills, and socialization, were very low to average. Plaintiff's academic ability and socialization skills were quite strong although his management of activities of daily living was very deficient. Dr. Reinfurt wondered if the low score might reflect low expectations from the family as well as ineffective management of behavior. (A.R. 355.)

Dr. Reinfurt's diagnosis was combined-type ADHD with relational problem not otherwise specified. (A.R. 356.) Dr. Reinfurt opined that the evaluation suggested that some control over Plaintiff's combined-type ADHD had been achieved. Also, she believed that Plaintiff's intellectual functioning was in the low average range and he was learning academic skills. Plaintiff's demonstrated quick receptivity to basic behavior management techniques suggested that he could be function at a more mature level and would have more stable moods if his mother and teachers were employing such tools. (A.R. 356.) Plaintiff had the ability to understand and respond to requests, instructions and questions at a nearly age-appropriate level. Plaintiff's communication skills involving the initiation, use, and comprehension of language were somewhat below average. Dr. Reinfurt recommended involvement in physical activity typical of Plaintiff's age group, management of his immature behaviors, and consideration of an Individual Education Plan or a 504 plan in the school setting. (Id.)

State agency psychiatrist, Dr. H. Bilik completed a childhood disability evaluation of Plaintiff on July 24, 2006, and opined that Plaintiff's ADHD, disruptive behavior disorder, speech delay, and receptive/expressive language delay were severe but did not meet, medically equal, or functionally equal the listings. (A.R. 345-53.) Dr. Bilik found less than marked limitations in all six domains. With respect to interacting and relating with others, Dr. Bilik noted that there was

less than a marked limitation in speech, relying on the improvement in Plaintiff's speech after therapy in 2005 and 2006 which reflected clear and coherent speech with normal vocal tone and prosody. (A.R. 347.)

Consulting, non-examining practitioner Patti Solomon-Rice, M.A., certified child counselor and speech and language therapist, conducted a speech and language review of Plaintiff on August 3, 2006. She concluded that the evidence permitted a determination that Plaintiff had less than marked impairments in both speech and language as well as in all domains. Her signature appears on the same page as that of H. Bilik. (A.R. 353, 345-50, 346.)

On January 10, 2007, Plaintiff, then a second grader, was evaluated by Joan Allen, L.C.S.W., and senior licensed mental health clinician at the county's DCFS, at the request of Plaintiff's mother. The mother was reporting that Plainiff had angry outbursts, was argumentative and had self-destructive behavior, distractibility causing failure to complete tasks, restlessness, temper tantrums, impulsiveness, and aggression, and difficulty playing with peers, who bullied him. (A.R. 314-23.) The mother reported that Plaintiff lied and stole, got into trouble, denied his mistakes or blamed others, failed to finish things, was easily frustrated, was childish, and did not like rules. (A.R. 308.)

Allen noted that Plaintiff's history included abandonment by his father, two years of homelessness that interfered with therapy in 2003 and 2004, therapy for half a year in 2005 and 2006, and medication with Concerta. Allen observed that Plaintiff's appearance, speech, and behavior were normal. His thought was logical, goal-directed, and coherent with content that was within normal limits. Allen opined that Plaintiff's immediate, short-term, remote, and long-term memory were intact and his abstraction, interpretation, judgment, insight, calculations, and general fund of information were fair. Allen felt that Plaintiff was cooperative but guarded. She noted that his mood was calm, angry, worried, and irritable with frequent anger and annoyance over trivial matters. Plaintiff's mother stated that Plaintiff had no affect, which caused difficulty in recognizing his feelings. (A.R. 320.) Plaintiff was oriented, and he denied hallucinations or delusions. With respect to medical necessity, Allen believed that there was probability of

significant impairment in living arrangement, health, social support, and daily activities. (A.R. 321.) Allen's diagnosis was ADHD, combined type, rule out oppositional defiant disorder, with a GAF score of 60. (A.R. 314, 321.) Allen believed that Plaintiff's strengths were that he was easily engaged and responsive to questions.  However, his special status situation was poor impulse control. Allen's clinical assessment summary noted that Plaintiff demonstrated intermittent disruptive behavior in school and numerous behavioral problems with aggression towards younger siblings, difficulty getting along with peers, disruptive behavior at home, poor judgment, arguments with and lying to his parent, externalization of blame, low frustration tolerance, and poor self-esteem. Allen's treatment plan was to reduce Plaintiff's angry outbursts from daily to two to three times a week via medication, outpatient services for Plaintiff and the family, and parenting classes for Plaintiff's mother.

On February 6, 2007, Dr. Sheikh refilled Plaintiff's Concerta for ADHD. (A.R. 303.)

Between February 5, 2007, and October 12, 2007, Plaintiff underwent rehabilitation counseling with Pierre Xiong, CMHS II, to help reduce angry outbursts and oppositional, defiant behaviors. (A.R. 249-197.) On numerous occasions, Plaintiff's mother failed to communicate about scheduling appointments or missed sessions. (A.R. 235, 231 [March 2007, a "number of missed sessions"], 232, 231 [mother chose to postpone therapy until anger management was completed], 228 [notes concerning mother's lack of cooperation and result of less frequent services], 214, 210, 208, 207, 206.) Xiong also met with Plaintiff's mother to encourage her to continue to give Plaintiff the support he needed. (A.R. 244.) Plaintiff was cooperative and followed directions well. (A.R. 243, 236, 232, 227, 225, 223.) Sometimes he had trouble focusing on tasks and following directions and needed redirection and encouragement to stay on track. (A.R. 239, 225, 223, [distraction still an issue], 215 [boundaries and distraction were issues].) Xiong recommended close supervision of Plaintiff's behavior at home. (A.R. 238.) Plaintiff reported improvement in his relationships with his peers at school and eventually his siblings, and an improved ability to focus on tasks, listen to his teacher, cope with anger, and participate in class activities. (A.R. 232-33, 227.)

In April and May 2007, Plaintiff's mother reported improvement at home but continuing problems with aggression and completion of tasks at school. (A.R. 226, 224.) In August 2007 (soon after Plaintiff had begun Risperdal in addition to Concerta), Plaintiff reported that he could not wait until school started again. (A.R. 209.) He seemed to follow directions a lot better, had good eye contact, participated in the session well and had a better understanding of his limits. (A.R. 209.) However, in September 2007, Plaintiff's mother reported that, after having missed the last few rehabilitation counseling sessions, Plaintiff had engaged in worsening behavior, with defiance, disruption, aggressive and immature behavior. and refusal to groom himself or complete tasks. The mother reported also that the teacher had called twice about Plaintiff's disruptive, inattentive behavior and refusal to complete his tasks. (A.R. 204.) Because Plaintiff's mother's work interfered with her bringing him to therapy, the therapist agreed to begin seeing him at school. (A.R. 204.) Plaintiff reported improvement with the exception of getting in trouble once in class; it was noted that he had good eye contact and a better understanding of his limits. (A.R. 203.)

By late September 2007, Plaintiff reported to Xiong that he was doing a lot better and was able to groom himself and get ready for school for the last few days without asking by his mother. He continued to have problems listening to his teacher, completing his tasks, and getting angry because he did not understand the work sometimes, and no one helped him. (A.R. 199.) By October 2007, Plaintiff reported that he was less angry because he behaved better and had better communication with his teacher. He reported that he asked for help and was able to complete his work and turn it in almost every day. (A.R. 197-98.)

On February 24, 2007, consulting, examining psychiatrist Dr. Ekram Michiel evaluated Plaintiff after reviewing medical records and obtaining a history from Plaintiff's mother. The mother reported to Dr. Michiel that Plaintiff had only started to speak a year previously, used to stay alone and would not communicate with the family, did not show any emotions, had angry outbursts and fights and could not focus or stay still, despite a year of medication with Concerta. The mother reported that the medication helped Plaintiff's hyperactivity but did not cure his

inability to concentrate. (A.R. 283-85.) Plaintiff's hobby was reading. When Dr. Michiel met with Plaintiff, initially he was laying down under the desk and did not want to come out. When he finally emerged, was hyperactive and went through all the paper on the examiner's desk and Dr. Michiel could not involve him in a conversation. Based on only history and observation, Dr. Michiel was "leaning to" (A.R. 284) the diagnosis of autistic syndrome based on delayed speech, isolated manner of behavior, and inability to communicate socially. However, Dr. Michiel noted that another "possible diagnosis" was attention deficit hyperactivity syndrome, based on his taking Concerta, which had helped a little. Dr. Michiel determined that Plaintiff's GAF score was 65. Dr. Michiel stated that he believed that Plaintiff could handle his daily activities, but he needed special education and attention and social therapy. However, Dr. Michiel noted that it was very difficult to assess his cognitive skills because of his resistance to getting involved in the interview. (A.R. 283-84.)

On April 18, 2007, non-examining state agency psychiatrist J. A. Collado, M.D., reviewed all the evidence in the file and the assessment of Patti Solomon-Rice conducted on August 3, 2006, and expressly affirmed the assessment of August 2006. (A.R. 275-78.)

On June 6, 2007, Plaintiff reported that his medication was somewhat effective but that he experienced sleep disturbance on Concerta. (A.R. 222.)

On June 6, 2007, Dr. Joseph Alimasuya, a child psychiatrist at Fresno County Mental Health Department (FCMH), performed a mental status examination of Plaintiff upon the referral of therapist Xiong for the purpose of medication evaluation. (A.R. 217-21.) Plaintiff was alert, oriented times two, with fair hygiene, poor eye contact, euthymic mood, tight thought associations, impaired insight, poor judgment, poor memory and concentration, impaired attention span, impulsivity, and distractibility. Dr. Alimasuya found that Plaintiff was not irritable or agitated but he was anxious. Plaintiff was not in special education programs at school. Dr. Alimasuya diagnosed ADHD, learning disorder, fetal alcohol effects, possible borderline intellectual functioning and an additional notation involving something illegible that was intermittent. (A.R. 221.) The GAF was 50. (A.R. 221.) The plan was to continue psychotherapy,

Concerta, and Risperdal. (A.R. 221.)

On July 25, 2007, Plaintiff reported that his medication was effective but that it caused him to have trouble falling asleep. (A.R. 213.)

On July 25, 2007, Dr. Linda Edhere-Ekezie, of the county's DCFS, children's mental health division, completed an assessment of Plaintiff in connection with his response to a change in medication (adding Risperdal) and lab results. Plaintiff reported improvement in response to the medication change and medication compliance, with normal sleep. Dr. Edhere-Ekezie found Plaintiff's cognition, orientation, thought content and mood were normal. She found that Plaintiff's affective range was flat, that he had latent speech and that his insight and judgment were impaired. However, Plaintiff was cooperative and alert with an organized thought process. Dr. Edhere-Ekezie determined that Plaintiff had average intelligence (with a note of a question mark preceding the words "borderline intellectual functioning"). Dr. Linda Edhere-Ekezie's diagnosis was Axis I, attention deficit disorder with hyperactivity; intermittent explosive disorder, learning disorder not otherwise specified and fetal alcoholic effects. On Axis II, she found borderline intellectual functioning, with a GAF score of 55. Dr. Edhere-Ekezie's plan was to medicate Plaintiff with Concerta and Risperdal and to have laboratory tests done. (A.R. 211.)

On September 27, 2007, Plaintiff's mother reported that the medication had a good effect without side effects. (A.R. 202.)

On September 27, 2007, Dr. Edhere-Ekezie reassessed Plaintiff's response to medication and recorded mental status exam results that were consistent with her earlier evaluation with the exception that Plaintiff's speech was normal. The diagnoses remained the same. (A.R. 200.) Dr. Edhere-Ekezie concluded that Concerta was not effective and should be discontinued. Instead, she started Plaintiff on Focalin to control his ADHD, increased the Risperdal for better mood control and reminded Plaintiff's mother a second time to obtain lab work for Plaintiff labs and for him to undergo an EKG. (A.R. 201.) A medication list from 2007 reflected that Plaintiff took Risperdal at bedtime to help him sleep and Focalin, prescribed in October 2007, during the day for ADHD. (A.R. 62, 64.)

1    V. <u>Lay Evidence of Functioning</u>

2        A. <u>Non-testimonial Evidence</u>

3    A school district form dated January 14, 2005, reflected that Plaintiff would spend ninety-
4  four percent of his time in general education and six percent in special education. (A.R. 111.) One
5  of two deficiency notices in the record issued on September 5, 2005, was for unsatisfactory
6  homework, daily work and lack of a serious approach in studies due to talking to others and
7  failure to return homework daily. (A.R. 83, 188.) A team meeting with Plaintiff's mother reflected
8  that Plaintiff was on grade level but returned only five of twenty homework assignments.  It noted
9  also that Plaintiff was unfocused, easily distracted, and lacked organizational skills.  Because he
10  had been diagnosed with ADHD, the report suggested that Plaintiff obtain medication and that the
11  homework should be put on a point system to improve consistency. (A.R. 81-82, 89-92.)

12    In December 2005, Plaintiff's mother stated in a function report that Plaintiff had
13  difficulty speaking, used little or no facial expressions, had a short attention span and could not
14  perform a three-step command.  She reported also that he lacked coordination, was bullied by
15  children and tended to play with younger children.  The mother stated that Plaintiff needed
16  prompting to take care of his hygiene, did not complete tasks, was socially awkward and did not
17  appear to grasp consequences of actions. (A.R. 144-53.)

18    Report cards for Plaintiff's first grade year (2005-06) reflected that in the first quarter,
19  Plaintiff was reading at the basic level but was highly distracted to the point of inability to keep up
20  in class.  Likewise, the report cord noted that Plaintiff's homework was not regularly returned. In
21  the second quarter, the teacher noted a tremendous amount of progress since Plaintiff began taking
22  medication, with reading at the advanced level.  However, the teacher reported that Plaintiff's
23  tardiness for school in the morning was a problem. In the third quarter, the report card noted that
24  Plaintiff continued to read at the advanced level and that he did well.  Similarly, in the fourth
25  quarter, Plaintiff had done an outstanding job, but the prescription for his medication needed to be
26  filled promptly.  Also, the teacher noted that Plaintiff needed to work on his fine motor skills.
27  (A.R. 85.)

28

In January 2006, forms from the individualized education program (IEP) reflected that Plaintiff did not meet eligibility criteria for disabilities and general education was chosen as the service option for Plaintiff's academic, non-academic, and extracurricular programs and activities. (A.R. 100.)

Plaintiff's first grade teacher, who at the time had known Plaintiff for six months, completed a questionnaire in which she noted that Plaintiff was reading at beginning first level, late kindergarten math, and beginning first or late kindergarten written language. (A.R. 364-71, 364.) The teacher noted that Plaintiff had a serious problem in expressing ideas in written form, obvious problems comprehending oral instructions and math problems, understanding and participating in class discussions, learning new material, recalling and applying previously learned material and applying problem-solving skills in class discussions. He had slight problems with comprehension of vocabulary, written material, and oral explanations. When he was not on medication, he was bothersome and unable to work, lacked self-control and the ability to sit still, and had many verbal altercations with peers in and outside of class. (A.R. 365.) With respect to attending and completing tasks, he had serious problems with organization, completing assignments, working without distracting himself or others, and working at a reasonable pace. (A.R. 366.) The teacher indicated that Plaintiff had obvious problems paying attention, focusing, and completing work without mistakes, and slight problems with carrying out single-step instructions, waiting to take turns, and changing activities. (A.R. 366.)

On the other hand, Plaintiff had no serious problems interacting and relating with others but had obvious problems with playing cooperatively with others, making and keeping friends, having conversations, interpreting facial expressions and body language, and using adequate grammar and vocabulary. Plaintiff's speech was difficult to understand but the teacher noted that Plaintiff was seeing a speech instructor twice a week at that time. (A.R. 367-68.) In the domain of moving about and manipulating objects, Plaintiff had very weak fine motor skills and had obvious problems moving and manipulating things, demonstrating strength and coordination, managing pace of activities, and integrating and executing controlled motor movements. (A.R. 368.) With

respect to caring for himself, Plaintiff had obvious problems identifying and appropriately asserting emotional needs, using appropriate coping skills to meet daily demands of the school environment and knowing when to ask for help.  The teacher noted that Plaintiff had slight problems handling frustration appropriately, being patient, and using good judgment. (A.R. 369.) The teacher had seen an improvement in Plaintiff's behavior since he had begun taking medications for ADHD. (A.R. 370.)

In March 2006, Plaintiff was declared a habitual truant for seven absences between August 2005 and February 2006 and the mother was notified that Plaintiff's attendance at school was needed for his success. (A.R. 75-77.) The school had referred the matter to the District Attorney. The school attendance presented the mother a contract dated March 17, 2006, that required the mother to have Plaintiff at school no later than 7:40 a.m. and gave her other information about her obligation to ensure that Plaintiff was in school.  However, the contract was not signed by the mother and it is not clear that she attended the March 17, 2006 meeting on this topic. (A.R. 80.) In December 2006, Plaintiff's mother reported to the County of Fresno's Department of Children and Family Services (DCFS) that Plaintiff was overly active, impulsive, easily distracted, and argumentative.  She reported that he hit children and had temper outbursts and difficulty with school work. He did not complete homework, had low self-esteem, lacked friends, was self-destructive, woke up at night and was shy.  However, the mother reported that Plaintiff's problems had not increased. (A.R. 324-27.) She noted that he was a smart, funny, sweet person and very loving when he wanted to be. (A.R. 327.)

In January 2007, the school continued to monitor Plaintiff's attendance. (A.R. 74.)

Report cards for second grade (2006-07) reflected mostly satisfactory citizenship, with problems following directions and with social skills, such as showing self-control and cooperation on the playground, which improved at the end of the year. His teacher reported that he struggled with following directions, paying attention, and showing self-control but she noted that he could put more effort into his work and was a capable young man. By the end of the year his progress was average except for his math, which was a "D+" and he still struggled with his social skills.

(A.R. 86.)

The second of two deficiency notices was issued on January 19, 2007, and was for unsatisfactory test scores in reading due to Plaintiff's rushing on his tests. The teacher noted that Plaintiff was very capable of doing better. (A.R. 83.)

Diedre Lowe-Brooks completed a teacher questionnaire on March 6, 2007, after Plaintiff had been in her class of seventeen students since August 2006 (approximately seven months). (A.R. 286-93, 294-301.) In the second quarter, Plaintiff had been absent once and tardy eight times. (A.R. 286.) In the domain of acquiring and using information, Plaintiff had no problem or a slight problem, when properly and regularly medicated, with understanding school and content vocabulary, comprehending and doing math problems, and expressing ideas in written form. (A.R. 287.) With respect to attending and completing tasks, Plaintiff had no problem carrying out single-step instructions, and a slight problem carrying out multi-step instructions, waiting to take turns, completing class and homework assignments, and working at a reasonable pace. The teacher noted that he had an obvious problem paying attention when spoken to directly, sustaining attention during play and sports activities, focusing long enough to finish assigned activities or tasks, changing from one activity to another without being disruptive, organizing things, completing work accurately without careless mistakes, and working without distracting others. Many of the problems manifested themselves daily. The teacher noted that Plaintiff was very capable but just had more difficulty when he was not able to take advantage of the medications. (A.R. 288.)

With respect to interacting and relating with others, the teacher noted that daily Plaintiff had slight problems playing cooperatively with others, making and keeping friends, seeking attention appropriately, following rules, and respecting and obeying adults. He had no problem expressing anger appropriately, asking permission appropriately, relating experiences and telling stories and using language appropriate to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, taking turns in a conversation, interpreting the meaning of facial expressions, or using adequate vocabulary and grammar to express thoughts and

ideas in general, everyday conversation. Again, Plaintiff was able to do well in this area, but being appropriately medicated was necessary. (A.R. 289.) Plaintiff had no problems moving about and manipulating objects. (A.R. 290.) With respect to caring for himself, Plaintiff had no problems being patient when necessary, taking care of hygiene or grooming, using good judgment concerning personal safety and dangerous circumstances, appropriately asserting emotional needs, responding appropriately to changes in his own mood, such as calming himself, and knowing when to ask for help. He had a slight problem handling frustration appropriately (occurring weekly) and using appropriate coping skills to meed daily demands of the school environment (daily). The teacher noted that this was the area where she believed that it was not that Plaintiff was not being cooperative; rather, the teacher just did not know if it was being followed through with at home by the mother on a daily basis. (A.R. 291.)

A teacher's questionnaire, completed in mid-October 2007 when the teacher had known Plaintiff for seven weeks, stated that Plaintiff was a very intelligent boy who was capable of doing the work, and when he did the work, it was usually pretty good; however, he had marked problems in the ability to stay seated or still, listen and remain attentive, organize, concentrate on schoolwork, finish things he started, stick to a play activity, learn new skills and keep up with peers, and acknowledge his own mistakes. The teacher noted that he had an extreme problem with thinking before acting. (A.R. 65-70.) The teacher had observed that Plaintiff agreed to participate in group situations but did not like to do so when he did not think he was good at the activity. Also, the teacher reported that sometimes he was aggressive verbally or physically towards a peer. As an example, the teacher reported that once the Plaintiff had tackled a child for no apparent reason. (A.R. 68.) He made noises, bothered other students, and could not sit still which, the teacher noted, had been reported by a teacher previously. (A.R. 69.)

Plaintiff's student assessment profile showed that he was below basic subject proficiency in state assessments in English Language Arts in test year 2007. Another set of assessments reflected that he was below basic level in math. (A.R. 71-72.)

       B. <u>Testimony at Hearing</u>

Plaintiff testified that he was eight years old and was in third grade, was good at writing stories and considered his whole class to be his friends. He liked to play soccer with classmates at recess and for PE. He testified that he could dribble and control the ball. He also played basketball and had played video games. Also, he rode his bike. (A.R. 437, 439-42.)

His mother testified that Plaintiff, who was eight years old and in third grade, was in regular classes, had a hard time interacting with children his age, was immature socially, repeated things, and forgot things easily. (A.R. 445-46.) He walked, talked, and achieved full bladder control late. (A.R. 446-47.) He had outbursts in which he quickly became really angry and screamed at the top of his lungs for twenty or thirty minutes and he would stomp off and hit whoever was in his way. (A.R. 447-48.) The mother reported that Plaintiff would bang his head on the wall or fidget with things and he became physical with the other kids daily. Id. The mother testified that none of her attempts at discipline worked. Plaintiff's mother reported that she "just let him have it" because she didn't want to spank him. (A.R. 449.) The mother reported that Plaintiff was seeing a counselor whom he had seen once a week for an hour for seven or eight months and it did help with Plaintiff's behavior. She reported that the counselor could calm him down and keep him level. (A.R. 450.) The mother reported that Plaintiff participated in treatment. (A.R. 450.) Plaintiff took Focalin and had been taking it for only about a month. She testified that previously he had taken Concerta for a year or so. He also took "Respiritol [phonetic]." Plaintiff had been doing "pretty good" on Focalin. (A.R. 451.)

Up until about a month before the hearing, the mother reported that the school would call because Plaintiff had disrupted the learning environment for the other students by making odd noises. When told to stop, Plaintiff would hit his desk and once threw a chair and screamed. The mother testified that the school had no discipline regimen. Instead, the school called Plaintiff's mother for her to talk to him. The mother reported that Plaintiff was suspended about a couple of months previously for one day for having scratched or hit a boy on the playground. The mother reported that she could not remember how the event started or what triggered it. (A.R. 452-53.) Plaintiff's mother thought he had been suspended twice in the present semester, that he had ten

total "marks," or event, warranting discipline, that semester, consisting mostly of disrupting the class or for playground behavior. Also, although Plaintiff did his homework and put it in his backpack which he took to school, for some reason the teacher was not getting homework. (A.R. 454.) Plaintiff's grades were pretty good, but his behavior got in the way of his grades. (A.R. 455.)

Plaintiff had hurt his siblings, including the baby, but Plaintiff's mother could not remember the last time she caught him doing something like that. (A.R. 456.) He could concentrate on a TV program for twenty or thirty minutes but he fidgeted with other things or looked elsewhere. (A.R. 458.) He would do his chores of taking out the trash, making his bed, and cleaning up messes in his room after he had a fit. (A.R. 458.) He said a couple of times that he would like to kill himself, most recently about a year previously. (A.R. 459.)

VI. Listing 112.05

The ALJ found that Plaintiff's ADHD, borderline intellectual functioning, learning disorder not otherwise specified, and fetal alcohol effects did not meet, medically equal, or functionally equal listing 112.11, pertaining to attention deficit/hyperactivity disorder, or listing 112.05F, pertaining to organic mental disorders plus another physical or mental impairment that significantly limited function. The ALJ explained that this was because Plaintiff did not have a marked level of difficulty or dysfunction in cognitive, social, or personal functioning, or marked difficulty in maintaining concentration, persistence, or pace, as required by the listing. (A.R. 13.)

The ALJ did not expressly address whether Plaintiff's impairments met, medically equaled, or functionally equaled listing 112.05C (mental retardation), an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.[1] Plaintiff argues that the ALJ had a duty expressly to address whether or not Plaintiff's impairments equaled listing 112.05C. Plaintiff asserts that an ALJ must always facially address all three steps (meeting a listing, medically equaling a listing, and functionally equaling a listing) in a child's disability claim. Further, Plaintiff argues that the ALJ should have consulted a medical expert on the subject.

It is Plaintiff's burden to establish that his impairment met a listing. Bowen v. Yuckert,

---

[1] The ALJ did note the absence of a diagnosis of mental retardation. (A.R. 13-14.)

21

482 U.S. 137, 146 n.5 (1987). Mere diagnosis of a listed impairment is not sufficient to sustain a finding of disability. There must also be the findings required in the listing. Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990); 20 C.F.R. § 416.925(d). Generally, specific medical findings are needed to support the diagnosis and the required level of severity. 20 C.F.R. §§ 404.1525, 416.925. The Commissioner is not required to state why a claimant failed to satisfy every different section of the listing of impairments; rather, it is sufficient to evaluate the evidence upon which the ultimate factual conclusions are based. Otherwise, an undue burden would be put on the social security disability process. Gonzales v. Sullivan, 914 F.2d 1197, 1200-01 (9th Cir. 1990).

Listing 112.05, the listing for mental retardation of children, contains six sets of criteria.[2] If an impairment satisfies the diagnostic description in the introductory paragraph and any one of the six sets of criteria, the child's impairment will be found to meet the listing. 20 C.F.R, part 404, subpart P, App. 1, § 112.00(1)(A). Section 112.05 of the listings provides that mental retardation is characterized by significantly sub-average general intellectual functioning with deficits in adaptive functioning. The required level of severity for the disorder is met when the additional requirements in any of the subsections A through F are satisfied.

Section 112.05C, the listing raised by Plaintiff (Brief pp. 6-7), requires a "valid verbal, performance, or full scale IQ of 59 or less," but this does not correspond with Plaintiff's argument concerning a listing level impairment being 70. Rather, § 112.05D provides for a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function. Likewise, § 112.05E requires a valid verbal, performance, of full-scale IQ of 60 through 70 and, for children aged three to eighteen, it must result in at least one of paragraphs B2b, B2c, or B2d of listing 112.02. The identified paragraphs of listing 112.02 describe specific marked impairments:

> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and

---

[2] Unless otherwise stated, all references to Listing 112.05 are to the version effective between December 18, 2007 and May 29, 2008. All references to the Code of Federal Regulations are to the version effective at the time of the ALJ's decision.

including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

Further, where "marked" is used as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. § 112.00(1)(C). A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based on age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis. Id. When standardized tests are used as the measure of functional parameters, a valid score that is two standard deviations below the norm for the test will be considered a marked restriction. Id. As it applies to primary school children, the intent of the functional criterion described in paragraph B2d, i.e., deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, is to identify the child who cannot adequately function in primary school because of a mental impairment. Although grades and need for special education placement are relevant factors, they are not conclusive due to variability in school districts' grading levels and criteria for special education placement. Id.

Here, the evidence that Plaintiff argues prompted a duty to discuss the listing is Plaintiff's score of 71 in verbal reasoning on the Stanford-Binet, a score of 71 in communication, 66 in daily living skills, and 67 in socialization on the Vineland test for adaptive functioning, and Dr. Battista's reports on the Vineland scores. (A.R. 423). Plaintiff also notes that Dr. Michiel commented on the difficulty of assessing cognitive function but did not quantify the degree of help necessary. Accordingly, argues Plaintiff, the ALJ's rejection of marked deficiencies established by Dr. Battista's testing did not have the support of substantial evidence.

The scores noted by Plaintiff appear to be pertinent to §§ 112.05D or 112.05E, and not 112.05C. However, in any event, even the Stanford-Binet scores resulting from Dr. Battista's

examination in June 2003 were not sufficiently low to be within the listing level range of 60 to 70. The lowest score was in verbal reasoning (71), whereas the scores for abstract/visual reasoning (89) and quantitative reasoning (88), the other areas tested, were much higher. Considering Plaintiff's particular problem with expressive and receptive verbal communication around the time of Dr. Battista's testing, and further considering Plaintiff's improvement after speech therapy, the Stanford-Binet scores do not appear to meet the listing's requirements.

As to the scores on the Vineland test for adaptive functioning, it is not clear that these tests measure "IQ" within the meaning of the listing. Dr. Reinfurt, whose results the ALJ credited (A.R. 14-15), stated that the Vineland scales largely explored a person's functioning in domains of communication, daily living skills and socialization (A.R. 355). In any event, the ALJ expressly gave great weight to the test results obtained by Dr. Reinfurt in May 2006 (A.R. 14-15), which appeared valid, and which reflected scores on the Wechsler Intelligence Scale for Children-IV, which measured intelligence and cognitive ability of children, of borderline to low average range of cognitive functioning (full scale IQ of 78, prorated verbal comprehension index of 89, prorated perceptual reasoning index of 82, working memory index of 83, and processing speed index of 75). (A.R. 14-15, 355.)

Plaintiff points to the fact that Dr. Battista stated that the Vineland scores he obtained back in 2003 were lower than he expected given the Stanford-Binet scores. (A.R. 423.) Dr. Battista stated that both observation and the IQ assessment caused him to expect higher Vineland scores. (A.R. 423.) Immediately following that remark, Dr. Battista stated that the scores were at least consistent with a child who was having limited verbal communication abilities. Limited functioning was explained as a result of a combination of weak verbal communication abilities and discipline/parenting variables. Dr. Battista opined that the behavioral issues appeared not to be based on cognitive problems, intrinsic social deficit, or problems with attention or level of activity. Instead, level of activity, sustained attention and social functioning aside from conduct issues were relatively intact. (A.R. 423-24.) Because Dr. Battista's assessment did not identify a cognitive problem, it did not create a duty on the part of the ALJ to evaluate the additional listing.

The Court likewise rejects Plaintiff's contention that the listing had to be addressed because Dr. Battista's Vineland test scores reflected marked limitations in daily living skills and socialization, and were only one point above marked with respect to communication. (A.R. 423.) The ALJ expressly found that Plaintiff did not have marked level of difficulty in cognitive, social, or personal functioning, or marked difficulty in maintaining concentration, persistence, or pace. (A.R. 13.) He reviewed each domain of functioning and the evidence pertinent to it. (A.R. 13-18.) In so doing, he articulated detailed reasons, which will be discussed below in connection with Plaintiff's contentions concerning the ALJ's handling of the expert opinions and medical evidence. It is clear from the ALJ's reasoning that the ALJ placed weight on other evidence.

Plaintiff points to Dr. Michiel's comment that it was very difficult to assess Plaintiff's cognitive skills because of Plaintiff's resistance to getting involved in the interview. (A.R. 284.) The comment appears to relate solely to Plaintiff's particular conduct at that interview. Therefore, it is not generally applicable or transferable to the findings of other examiners, who did not experience the same behavior. Further, the ALJ expressly stated that Plaintiff's presentation at the consultative exam was atypical. (A.R. 15.)

Finally, the Court rejects Plaintiff's contention that the ALJ was required to consult with a medical expert concerning the inconsistent test scores, Plaintiff's intelligence quotient, or whether or not Plaintiff met the listing. In support of this argument, Plaintiff cites to <u>Howard ex rel. Wolff v. Barnhart</u>, 341 F.3d 1006, 1014 (9th Cir. 2003), which discussed 42 U.S.C. § 1382c(a)(3)(I), which provides:

> In making any determination under this subchapter with respect to the disability of an individual who has not attained the age of 18 years and to whom section 421(h) of this title does not apply, the Commissioner of Social Security shall make reasonable efforts to ensure that a qualified pediatrician or other individual who specializes in a field of medicine appropriate to the disability of the individual (as determined by the Commissioner of Social Security) evaluates the case of such individual.

The Court notes that the statute refers to § 421(h), which in turn relates to evaluation of mental impairments by qualified medical professionals, and specifies that an initial determination that an individual is not under a disability, where there is evidence indicating the existence of a mental

impairments, shall be made only if the Commissioner has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

Assuming that § 1382c applies to Plaintiff, the Court notes that psychiatrist Dr. J. A. Collado, reviewed all the evidence in the file as well as the previous assessment from 2006 and affirmed the earlier assessment. It appears that an appropriate specialist reviewed the entire case and rendered an opinion as to RFC.

Further, Plaintiff has not established that the ALJ otherwise had a duty to obtain further medical information. It is the claimant who bears the burden of proving that he is disabled. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). The duty to develop the record arises where the record before the ALJ is ambiguous or inadequate to allow for proper evaluation of the evidence. 20 C.F.R. §§ 404.1512(e) and 416.912(e); Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005); Mayes v. Massanari, 262 F.3d 963, 968 (9th Cir. 2001).

Here, the ALJ did not find any inadequacy or ambiguity that prevented evaluation of the evidence. Rather, the ALJ, with support in the record, found the evidence adequate to make a determination regarding Plaintiff's disability. Accordingly, the Court concludes that the ALJ did not have a duty to recontact the doctors.

In summary, in light of the foregoing, and considering the following analysis concerning the ALJ's reasoning concerning the extent of Plaintiff's functional limitations, the Court concludes that it was unnecessary for the ALJ to discuss whether Plaintiff's impairments equaled listing 112.05C through 112.05E.

VII. Expert Opinions concerning Marked Limitations

Plaintiff contends that the ALJ's conclusion that Plaintiff's functional limitations were not marked was not supported by substantial evidence. Plaintiff does not comprehensively address the ALJ's analysis, but rather argues in a scattered fashion that the ALJ wrongfully rejected some opinions tending to show marked symptoms or limitations, wrongly relied on lay evidence and erred in failing to address and give controlling weight to the opinion of Dr. Bishop.

In determining whether Plaintiff's severe impairments functionally equal the listings, an ALJ determines whether the impairments were of listing-level severity, i.e., whether they resulted in marked limitations in two domains of functioning, or an extreme limitation in one domain. 20 C.F.R. § 416.926a(a). The functional domains to be considered include 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for oneself; and 6) health and physical well-being. § 416.926a(b)(1).

In determining the extent of the limitations, all relevant factors are considered, including but not limited to, how well the minor can initiate and sustain activities, how much extra help the minor needs, and the effects of structured or supportive settings. Also, relevant factors include how the minor functions in school and the effects of medications or other treatment. § 416.926a(a)(1). Information considered includes not only medical signs, symptoms, and laboratory findings but also descriptions of functioning from parents, teachers, and other people who know the minor. § 416.926a(e)(1).

As previously noted, a "marked" limitation is found when an impairment interferes seriously with the ability independently to initiate, sustain, or complete activities, or is more than moderate but less than extreme. An extreme limitation is found when an impairment interferes very seriously with the ability independently to initiate, sustain, or complete activities. § 416.926a(e)(2), (3).

With respect to expert opinions, the standards for evaluating treating source's opinions are as follows:

> By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians. See 20 C.F.R. § 404.1527. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." Id. § 404.1527(d)(2). If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. Id. § 404.1527(d)(2)(i)-(ii). Generally, the opinions of

examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. Id. § 404.1527(d)(1)-(2). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007). With respect to proceedings under Title XVI, the Court notes that an identical regulation has been promulgated. See, 20 C.F.R. § 416.927.

As to the legal sufficiency of the ALJ's reasoning, the governing principles have been restated recently.

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. Lester [v. Chater, 81 F.3d 821, 830 (9th Cir.1995) (as amended).] Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. Id. (internal quotation marks omitted). Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. Id. at 830, quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. Magallanes [v. Bowen, 881 F.2d 747, 751 (9th Cir.1989).] The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir.1988). Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.1998); accord Thomas, 278 F.3d at 957; Lester, 81 F.3d at 830-31.

Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

Lay witnesses, such as friends or family members in a position to observe a claimant's symptoms and daily activities, are competent to testify to a claimant's condition. The Commissioner will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work. Dodrill v. Shalala, 12 F.3d 915, 918-19 (9th Cir. 1993). An ALJ cannot discount testimony from lay witnesses without articulating specific reasons for doing so. Id. at 919. However, it is appropriate for an ALJ to rely on medical evidence in rejecting inconsistent testimony. Lewis v. Apfel, 236 F.3d 503, 511-12 (9th Cir. 2001) (noting the propriety

of rejecting family members' testimony in part because of inconsistency with medical history generally alluded to in the decision); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). Likewise, it is permissible to rely on the Plaintiff's testimony regarding his impairments in discrediting a treating physician's opinion. Fisher v. Schweiker, 568 F.Supp. 900, 903 (N.D.Cal. 1983).

Here, the ALJ chronologically reviewed the longitudinal medical evidence and concluded that it showed that although Plaintiff had ADHD and behavioral problems but that his impairments had responded well to medication. (A.R. 13-16.) Further, his mother had not been consistent in taking him for counseling and his condition deteriorated when several consecutive sessions were missed. (A.R. 16.) The ALJ concluded that Plaintiff's mother's credibility was questionable because she testified at the hearing that Plaintiff had received weekly therapy since age five, but the evidence showed that his opportunity for counseling had been sporadic. (Id.) The ALJ noted that the positive effects of treatment were apparent in the teacher questionnaires that were submitted. (A.R. 16.)

The ALJ legitimately relied on the overall medical evidence of record. An ALJ is entitled to draw inferences logically flowing from the evidence. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). To the extent that medical evidence is inconsistent or conflicting, it is the responsibility of the ALJ to resolve any conflicts. Morgan v. Commissioner, 169 F.3d 595, 603 (9th Cir. 1999); Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996); Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992).

The ALJ also noted Plaintiff's mother's incorrect statements to Dr. Michiel concerning Plaintiff's history and concluded that it further diminished her credibility. (A.R. 15.) The ALJ concluded that Plaintiff's impairments could reasonably have been expected to produce the alleged symptoms, but the statements about the intensity, persistence, and limiting effects of the

symptoms were not entirely credible. (Id.)[3]  Plaintiff does not challenge these credibility findings.

The fact that an opinion is based primarily on the patient's subjective complaints may be properly considered. Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). Where even a treating source's opinion is based largely on the Plaintiff's own subjective description of his or her symptoms, and the ALJ has discredited the Plaintiff's claim as to those subjective symptoms, the ALJ may reject the treating source's opinion. Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989). The ALJ thus appropriately considered the role of Plaintiff's mother as historian or reporter and the integrity of the information on which various evaluations were based, and he stated specific, legitimate reasons for rejecting opinion evidence based on unreliable information.

The ALJ's concern for the availability and effect of treatment was also legally correct. It is established that an impairment that can reasonably and effectively be controlled by medication is not disabling for the purpose of determining eligibility for SSI benefits. Warre v. Commissioner of Social Security Admin., 439 F.3d 1001, 1006 (9th Cir. 2006); see, Odle v. Heckler, 707 F.2d 439, 440 (9th Cir. 1983).

The ALJ also expressly set forth his reasoning concerning the findings and opinions of the experts. (A.R. 13-18.)

The ALJ reviewed the medical evidence, which was generally inconsistent with disability. The more consistent an opinion is with the record as a whole, the more weight will be given to the opinion. 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)94). It is appropriate for an ALJ to consider the absence of supporting findings and the inconsistency of conclusions with the physician's own findings, in rejecting a physician's opinion. Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995);  Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992); Magallanes v. Bowen, 881 F.2d

---

[3] Plaintiff's mother had asserted that Plaintiff kicked and scratched a child, had been suspended from school, and had outbursts, trouble interacting with other children, and disruptive behavior; he got good grades, but his behavior got in the way. She reported that Plaintiff had been receiving weekly counseling since he was five; he could focus on television but looked around and fidgeted; and he did his chores but only after having a fit. He had reported wanting to kill himself, most recently a year before; he had no facial expressions, so she could not tell what his emotional state was. (A.R. 13.)

1  747, 751 (9th Cir. 1989).

2      The ALJ referred to the early testing in 2003 that revealed an absence of mental

3  retardation but the presence of receptive and expressive language disorder and normal hearing.

4  (A.R. 14, 423-24.) He relied on the DCFS evaluator's note that Plaintiff's symptoms of

5  hyperactivity, oppositional and conduct disordered behavior and symptoms of depression and

6  anxiety resulted in part from a lack of consequences for Plaintiff's misbehavior, and on the fact

7  that in October 2004, Plaintiff's case was closed because he had not been seen since December

8  2003. (A.R. 14.) The ALJ noted that when Plaintiff's mother began attending a parenting group

9  and Plaintiff began outpatient counseling in August 2005, Dr. Bishop, who led the parenting

10  group, stated that Plaintiff's mother was implementing behavior strategies and would need less

11  frequent meetings. (A.R. 14, 374.) The ALJ referred to the note of LCSW Harris from early 2006

12  to the effect that Plaintiff, who was a bright child, had anger outbursts at home, but it was not

13  reported that this was happening at school. (A.R. 14, 309.) The ALJ recited in detail the findings

14  and test results from Dr. Reinfurt's examination in May 2006, and he noted that he gave weight to

15  the opinion because it was based on testing that appeared valid. (A.R. 15.)<sup>4</sup>

16      The ALJ noted the opinion of Dr. Michiel from February 2007 but gave little weight to it

17  because it was premised on incorrect assertions that Plaintiff did not speak until age seven, did not

18  communicate with family members, and did not socialize, whereas the record reflected that

19  Plaintiff had delayed speech but talked with family and at school and played with other children.

20  Further, Plaintiff's presentation at Dr. Michiel's examination was atypical. (A.R. 15.) The ALJ

21  also stated that Plaintiff's failure to qualify for CVRC (Central Valley Regional Center) or a 504

22  plan, and the discontinuance of the individual education plan (IEP) all indicated that he did not

23  have autism. (A.R. 15.)

24      The ALJ noted the gap in the counseling record until Plaintiff was again assessed in

25  January 2007, at which time Plaintiff was calm but irritable, with restricted affect, intact long-

26  term and short-term memory, and fair insight and judgment, with no suicidal ideations. (A.R. 15.)

27

28
      _____
      <sup>4</sup> The ALJ had expressly noted the unusual circumstances surrounding Dr. Michiel's evaluation (A.R. 15)

The ALJ noted that upon follow-up, Plaintiff's mother reported that Plaintiff was doing much better since he was taking medication, although she still wanted services for her son. (Id.)

The ALJ also noted the record of Plaintiff's counseling in 2007, with indications of Plaintiff's cooperative attitude, his ability to follow directions well, his work on concentration and disruption reduction techniques, and his reports of improving interaction with family and friends, improved listening and coping with anger, and an absence of problems and fights. (A.R. 15.) The ALJ noted that services were reduced in frequency after Plaintiff and his mother missed several appointments. (A.R. 15.) He noted that Dr. Alimasuya added Risperdal in June 2007. Plaintiff reported doing well to therapist Xiong with improved coping with anger and good listening to his mother and teacher. He reported improvement to Dr. Edhere-Ekezie in July and September resulting from an increase in his medication. (A.R. 16.) The ALJ then noted that after Plaintiff had been out of medication for a week, he was hyperactive. However, his therapist later noted that he was following directions much better and had a better understanding of his limits. After missing several counseling appointments, Plaintiff's behavior worsened. (A.R. 16.) Plaintiff's behavior improved after Dr. Edhere-Ekezie discontinued Concerta and prescribed Focalin. (A.R. 16.)

The medical evidence in the record supported the ALJ's conclusions that Plaintiff's problems had responded well to medication and counseling, although sometimes his mother had not followed through with counseling and medication. Substantial evidence supported the ALJ's specific, legitimate reasoning concerning the overall medical record and the opinions.

The ALJ also made specific findings with respect to each functional domain. In finding that Plaintiff had less than marked limitations in the domain of acquiring and using information, the ALJ relied on the questionnaires of Plaintiff's second grade teacher, who had taught Plaintiff for eight months when she evaluated him, and who opined that Plaintiff had only slight problems in vocabulary, math, and writing. The ALJ also relied upon the report of Plaintiff's first grade teacher, who stated that Plaintiff had obvious problems in several areas and a serious problem in expressing ideas in written form, but indicated that Plaintiff subsequently showed improvement after beginning to take medication. (A.R. 16.) The ALJ gave little weight to the questionnaire of

Plaintiff's third grade teacher, who had reported in October 2007 that Plaintiff had marked problems in learning new skills and keeping up with peers, because the teacher had only taught Plaintiff for seven weeks at the time of the evaluation. (A.R. 16.) The ALJ also relied on therapist Harris's statement that Plaintiff was a bright child who caught on quickly and that standardized tests indicating borderline to low average intellectual functioning. He relied also on the finding in September 2005 that Plaintiff was ineligible for a 504 accommodation plan and that, Plaintiff was not referred for special education and, instead, he was placed in an IEP that was structured to meet his needs for speech and language services only and not for academic assistance. Finally, the ALJ relied upon Plaintiff's capacity to work at grade level. (A.R. 16-17.)

Also, the ALJ appropriately relied on the medical evidence concerning cognitive function and lay evidence concerning Plaintiff's cognitive and communicative function, including standardized intelligence tests and school records. 20 C.F.R. §§ 416.926a(e)(4), 416.924a(a); 20 C.F.R., pt. 404, subpt P, App. 1, § 112.00(1)(C)(2), (3). Substantial evidence supported the ALJ's reasoning concerning Plaintiff's having less than marked limitations in acquiring and using information.

With respect to the domain of attending and completing tasks, the ALJ concluded that Plaintiff had less than marked limitations. (A.R. 17.) The ALJ noted the student study team meeting in September 2005 that reported that Plaintiff was easily distracted, fidgety, and lacking in organizational skills. (A.R. 17, 81-82) The ALJ noted also the statement of the first grade teacher that Plaintiff had a serious problem in organization, completing assignments, completing work accurately, working without distracting himself or others, and working at a reasonable pace, such that she gave him extra time to complete his work. (A.R. 17, 366) Also, the ALJ took note of Plaintiff's second grade teacher's statement that he had obvious problems in organization and completion of work and in sustaining attention and focus. However, the ALJ noted that the first and second grade teachers said Plaintiff improved after starting medication and that the second grade teacher stated that Plaintiff was very capable but suffered more difficulty when not medicated.

Further, the ALJ relied on the medical evidence reflecting improvement with medication and counseling, and deterioration in the absence of medication and counseling. (A.R. 17.) He placed less weight on the third grade teacher's assessment because of the short time he had known Plaintiff. The ALJ expressly referred to his previous discussion of the medical evidence, which he had interpreted and evaluated, as showing that Plaintiff improved with medication and counseling and responded to medication changes. The ALJ concluded that Plaintiff's restrictions were less than marked because although Plaintiff had obvious problems, he improved when appropriately treated. (A.R. 17.) The ALJ adverted to the evidence that might support a finding of greater limitations, and stated germane, pertinent, and legitimate reasons for his weighing of the lay and medical evidence, respectively.

The ALJ concluded that Plaintiff had less than marked limitation in interacting and relating with others. (A.R. 17.) The ALJ reasoned that although Plaintiff's ADHD disorder and anger issues affected his ability to relate to family members and peers, his symptoms improved with medication and counseling. After Plaintiff received speech therapy, speech therapist Sachs had opined that the initial testing results were no longer appropriate because of improvement to the point of being ninety per cent understandable, with ability to make his needs known and to follow single-step instructions, that his speech was normal in rate and intensity, and placement in special education under an IEP was discontinued in January 2006 because of improvement. (A.R. 18.) Further, in May 2006 the consultive examiner noted Plaintiff's clear and coherent speech, and in October 2007, Plaintiff's third grade teacher had responded that Plaintiff did not have any problem with speech. (A.R. 18.) His speech disorder, which had affected his social interaction, had improved.

Plaintiff argues that this finding is inconsistent with Plaintiff's teacher's assessment in January 2006 of Plaintiff's many obvious problems in conversation, use of vocabulary, and playing cooperatively with others and making and keeping friends. Plaintiff notes that the teacher had stated that it was necessary to discipline Plaintiff with time outs and relocating his seat to a location close to the teacher. (A.R. 367.) He also points to a teacher's statement that Plaintiff had

a speech impediment in 2006. (A.R. 368.) However, it was for the ALJ to evaluate the evidence overall. No one piece of evidence is determinative because the regulations require reference to all relevant factors and expressly provide that no single piece of information taken in isolation can establish the extent of a limitation. 20 C.F.R. § 416.926a(a), (e)(4). The ALJ's reasoning concerning Plaintiff's mother's lack of credibility and Plaintiff's sufficient improvement with medication and treatment was supported by substantial evidence.

The Court rejects Plaintiff's related contention that the ALJ's analysis was insufficient because it addressed only Plaintiff's speech disorder. The foregoing discussion demonstrates that the ALJ also stated reasoning concerning the improvement in Plaintiff's symptoms that affected his ability to relate to family and peers. (A.R. 17.)

The ALJ found that Plaintiff had less than marked limitations in moving about and manipulating objects. He relied on the IEP of January 2006 that stated that Plaintiff had weak fine motor skills and needed some improvement in gross motor skills. (A.R. 18, 99.) Plaintiff argues that his teacher's assessment in 2006 that he had very weak fine motor skills (A.R. 368) precludes the ALJ's findings. The teacher stated that when compared to the functioning of same-aged children without impairments, Plaintiff had obvious problems with moving and manipulating things, strength, coordination, dexterity, and planning and executing controlled motor movements. (A.R. 368.) The teacher did not classify the problems in this domain as serious or very serious; rather, she classified most of them as only obvious. (A.R. 368.) The teacher's assessment was thus not inconsistent with the ALJ's conclusion, which was that Plaintiff had no impairment that interfered markedly, or seriously, with functioning. 20 C.F.R. § 416.926a(e)(2).

With respect to Plaintiff's ability to care for himself, the ALJ concluded that Plaintiff's limitations were less than marked because Dr. Reinfurt stated Plaintiff was immature for his age, and his ADHD caused impulsivity that might cause him to make rash or unsafe decisions or poor choices. Also, his anger issues caused him to run the risk of harm by retaliation; and the teacher questionnnaires did not note any significant deficiencies in this area. (A.R. 18.)

Plaintiff argues that this conclusion is foreclosed by the notation of Plaintiff's teacher in

2006 that Plaintiff's problems in this area were daily and weekly. (A.R. 369.) However, Plaintiff's teacher described the extent or seriousness of these problems, and none were rated as serious or very serious. The teacher found obvious problems with identifying and appropriately asserting emotional needs, using appropriate coping skills to meet the daily demands of the school environment, and knowing when to ask for help. The teacher noted also that Plaintiff had slight problems with handling frustration appropriately, being patient, taking care of personal hygiene, using good judgment regarding personal safety and dangerous circumstances, and responding appropriately to mood changes. (A.R. 369.) Considering the absence of the indication of a serious problem, this evidence does not undercut the ALJ's reasoning.

The ALJ found that Plaintiff had less than marked limitations in the domain of health and physical well-being. Plaintiff had been prescribed medication for ADHD, but the medical evidence reflected his running out of medication and suffering a decline in his functioning; thus, he had no marked limitations. (A.R. 18.)

Without relating his criticism to any specific domain, Plaintiff argues that the 2003 report from Dr. Battista established marked limitations in "activities of daily living and socialization," and unidentified[5] evidence of academic, social, and memory functions markedly limited Plaintiff "in multiple domains." (Brief p. 7.) As previously noted, the ALJ stated specific, legitimate reasons for the weight he put on various medical opinions. He appropriately concluded that the later testing was valid and probative of Plaintiff's functioning. Further, Dr. Battista's testing preceded the 2005 filing date of Plaintiff's application and thus was of limited relevance.

Plaintiff also refers to multiple assessments, which actually constitute one teacher's assessment of multiple functions in January 2006. (A.R. 364-71) Plaintiff asserts that this showed one serious and multiple obvious and slight problems in acquiring and using information, serious and obvious problems in attending and completing tasks, obvious and slight problems in interacting and relating with others, obvious problems in moving about and manipulating objects (weak fine motors skills and a speech impediment with speech instruction twice a week), and

---

[5] Plaintiff cites to A.R. 469, but no such page exists in the administrative record. (Brief p. 7.)

obvious and slight problems, occurring daily and weekly, with caring for himself. However, the ALJ stated specific, legitimate and germane reasons for his evaluation of this lay evidence when he noted the teacher's statement that Plaintiff showed improvement after beginning medication over the winter break, referred to the inconsistent information from the second grade teacher, and noted medical evidence supporting a finding of better ability to function. (A.R. 16-17.)

Plaintiff points to several opinions as to Plaintiff's global assessment of functioning (GAF), including Dr. Hellwig's assessment of Plaintiff in July 2005 (GAF of 50) (A.R. 402-06, 395-96), Dr. Alimasuya's assessment of June 2007 (GAF of 50) (A.R. 217-21), and Dr. Edhere-Ekezie's evaluations of July and September 2007 (GAF of 55) (A.R. 200, 211). Plaintiff argues that this evidence precluded the ALJ's conclusions.

A GAF, or global assessment of functioning, score is a report of a clinician's judgment of the individual's overall level of functioning that is used to plan treatment and to measure the impact of treatment as well as to predict its outcome. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., text revision) (DSM-IV-TR). A GAF score does not have a direct correlation to the severity requirements in the SSA listings of mental disorders. Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 F.R. 50746, 50764-65 (August 21, 2000). Neither SSA regulations nor governing case law requires an ALJ to take a GAF score into consideration in determining the extent of disability. See Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002) (holding that a GAF score is not essential to an ALJ's RFC for it to be an accurate RFC; mere failure to refer to it in a decision is not sufficient to render an RFC inaccurate). A GAF score may be considered in connection with determining the nature and extent of an impairment and the credibility of pain testimony. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

A GAF score of 50 (i.e., in the range of 41-50) indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR at 34. A GAF within the range of 51 through 60 indicates moderate symptoms (e.g., flat affect and

circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id.

The ALJ's conclusions were not necessarily undercut by the GAF assessments. Dr. Edhere-Ekezie's assessments were that Plaintiff had only moderate symptoms and difficulties. Further, Dr. Hellwig's assessment preceded Plaintiff's treatment with medication. It was only about a month after Dr. Alimasuya's assessment that Dr. Edhere-Ekezie reported that Plaintiff had in turn reported improved symptoms with the change in medication (addition of Risperdal). Thereafter, she further adjusted Plaintiff's medications by substituting Focalin for Concerta. The ALJ's reasoning concerning Plaintiff's response to treatment was specific and legitimate and was supported by substantial evidence in the record.

Plaintiff points to a plan of care formulated with therapist Xiong in February 2007 that reflected that the consumer's desired outcome was to be able to cope with anger outbursts and get along with siblings and peers better. Also, that the problem or symptoms were that Plaintiff presented aggressive behavior towards others, disruptive and oppositional/defiant behaviors, and low frustration tolerance. (A.R. 247.) Plaintiff also points out the update to the plan of care that issued a couple of weeks later and indicated that Plaintiff's mother had reported impulsiveness and poor judgment (A.R. 241), and Xiong's note from September 2007 reflecting reports of deteriorating performance in school at that time. These assessments appear to have been based in large part on Plaintiff's mother's reports. Further, they preceded Plaintiff's extended counseling with Xiong and his improvement due to medication adjustment thereafter.

Plaintiff also points to his own admission in May 2007 that, despite not having been involved in fights with siblings or peers and even though he was able to listen to his mother and teacher and to cope with his anger better, he did cross the line sometimes, but not as much as he did before. (A.R. 223.) This statement shows improvement as much as it reflects continued problems. Further, the precise substance of Plaintiff's crossing the "line" is unclear. However, again, this evidence relates to the period before Plaintiff's continued counseling and further changes to medication, upon which the ALJ legitimately put weight with the support of

substantial evidence.

Plaintiff argues that the ALJ erred in not addressing and crediting the report of Dr. Bishop. Plaintiff relates this to the ALJ's discussion of academic functioning, but he also relates it to family functioning. It is thus not clear to which domain or domains Plaintiff is referring.

Dr. Bishop found in early July 2005 that Plaintiff's untreated symptoms were seriously disrupting Plaintiff's academic and family adjustment, and he recommended outpatient therapy. (A.R. 250, 430.) Thereafter, he was the therapist for Plaintiff's mother's therapeutic parenting group in 2005. (A.R. 373-81.)

The ALJ's opinion must contain sufficient findings to permit intelligent judicial review. An ALJ need not discuss all evidence in the record, but the ALJ may not reject significant probative evidence without explaining why it was rejected. Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

Here, the record contains a general summary of Dr. Bishop's assessment, which was rendered in July 2005, more than three months before the date of Plaintiff's application for SSI benefits. Considering the nature of the evidence and the time it came into existence, and further considering the fact that it pertained to a time before Plaintiff was medicated or experienced counseling to any significant extent, the Court concludes that the ALJ's failure expressly to advert to Dr. Bishop's report was not erroneous. The ALJ necessarily concluded that the pretreatment evidence of the extent of Plaintiff's symptoms was outdated or rendered insignificant by the evidence concerning later evaluations and the effects of treatment.

VIII. Disposition

Based on the foregoing, the Court concludes that the ALJ's decision was supported by substantial evidence in the record as a whole and was based on the application of correct legal standards.

Accordingly, the Court AFFIRMS the administrative decision of the Defendant Commissioner of Social Security and DENIES Plaintiff's Social Security complaint.

The Clerk of the Court IS DIRECTED to enter judgment for Defendant Michael J. Astrue,

Commissioner of Social Security, and against Plaintiff K. F., who proceeds by and through his guardian ad litem.

IT IS SO ORDERED.

Dated:  **February 11, 2010**                                          **/s/ Jennifer L. Thurston**
                                                                    UNITED STATES MAGISTRATE JUDGE